LAWRENCE L. MC ALPINE AND CELESTE W. MC ALPINE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
MC ALPINE v. COMMISSIONER
Docket No. 15347-80.
United States Tax Court
T.C. Memo 1984-162; 1984 Tax Ct. Memo LEXIS 510; 47 T.C.M. (CCH) 1403; April 2, 1984. *510 Respondent disallowed deduction for charitable contribution of $40,166 and determined return was fraudulent because petitioner-husband knew claimed contribution was not made and/or recipient did not qualify to receive deductible contributions; furnished revenue agent with a false document in support of deduction; and made false statements to special agents. Held, evidence of alleged false statements including petitioner's testimony is admissible even if statements originally obtained in violation of petitioner's rights under Fifth Amendment. Brod v. Commissioner,65 T.C. 948 (1976). Held,further, under facts of this case such evidence is not entitled to full weight because petitioner was misled into believing his statements were "off the record" and the possibility that special agents (1) misunderstood petitioner's statements, (2) failed to seek second interview to confirm or clarify discrepancies, and (3) were possibly biased in their report of such statements because of animosity toward petitioner. Held,further, addition to tax under section 6653(b) is not sustained because respondent failed to prove fraud with clear and convincing evidence. *511 R. D. Worsley and John W. Ambrecht, for the petitioners. Marc J. Winter, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined that for the *512 year 1976 there was due from the petitioners a deficiency in income tax in the amount of $33,621, excise tax in the amount of $90 under section 1973, [1] and an addition to tax under section 6653(b) of $16,811. Prior to trial, several issues were conceded by the parties including a concession by the petitioners that the statutory notice was issued within the period provided by section 6501(a). At trial, the issues presented were: (1) whether the petitioners are entitled to a deduction for a charitable contribution in the amount of $40,166; and (2) whether the petitioners are liable for the addition to tax under section 6653(b) in the amount of $16,811. On brief, the petitioners have conceded that they are not entitled to the charitable deduction because the recipient of the contribution did not qualify under section 170(c). Consequently, the only issue remaining is whether or not the petitioners are liable for the addition to tax for fraud as provided by section 6653(b), and since this issue is a question of fact to be determined from the record as a whole, [2] we will combine our findings of fact and opinion. *513 Petitioners Lawrence L. McAlpine and Celeste W. McAlpine, husband and wife, resided in Santa Barbara, California, during 1976 and at the time they filed their petition. During 1976 Lawrence L. McAlpine was a practicing physician and a 50 percent shareholder in a professional medical corporation known as South Coast Pathology Services, Inc. He was also president of the corporation. Both his office and the office of the corporation were at 815 Cooper Road, Oxnard, California. Celeste W. McAlpine was a laboratory technician employed by the County of Santa Barbara. On May 13, 1977, the petitioners filed a joint income tax return for 1976 with the Fresno Service Center of the Internal Revenue Service. On the return the petitioners claimed a deduction for "total cash contributions supported by receipts" in the amount of $40,166. The 1976 return as well as the returns of the medical corporation for the fiscal years ending on April 30, 1976, 1977, and 1978 were thereafter audited by Revenue Agent William D. Burns. During the audit, and pursuant to the recommendation of Revenue Agent Burns, the returns were referred to the Criminal Investigation Division (CID) and assigned to Special *514 Agent Keith H. Billings for investigation. His investigation continued from March of 1980 until September 2, 1980, at which time he recommended "that this case be discontinued by the Criminal Investigation Division due to lack of criminal prosecution potential." In his withdrawal memorandum the special agent also stated that the "claimed contribution of $40,000.00 * * * appears to be highly questionable." In the meantime, on May 13, 1980, the respondent had issued a deficiency notice to the petitioners. In his notice the respondent disallowed the deduction claimed by the petitioners for the charitable contributions, made the other adjustments which have now been disposed of by concessions, and determined that all or part of the underpayment of tax in 1976 was due to fraud within the meaning of section 6653(b). Section 6653(b) provides that "if any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." The burden of proving fraud under section 6653(b) is upon the respondent *515 and he must prove the same by clear and convincing evidence. Section 7454(a); Rule 142(b); Arlette Coat Co. v. Commissioner,14 T.C. 751 (1950); Green v. Commissioner,66 T.C. 538 (1976). To carry his burden in this case the respondent must prove that the petitioners deliberately intended to evade taxes which they knew were owed by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Acker v. Commissioner,26 T.C. 107 (1956), affd. in part, revd. in part 258 F.2d 568 (6th Cir. 1958), affd. 361 U.S. 87 (1959). Since fraudulent intent can seldom be established by direct evidence, it is well settled that circumstantial evidence can be used by the respondent in his proof of fraud. Klassie v. United States,289 F.2d 96 (8th Cir. 1961); Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); *516 Grudin v. Commissioner,536 F.2d 295 (9th Cir. 1976). It is also well settled that the deliberate overstatement of a deduction, or a deliberate attempt to claim a nonexistent deduction, may constitute a fraudulent underpayment of tax under section 6653(b). Estate of Temple v. Commissioner,67 T.C. 143 (1976); Hicks Co. v. Commissioner,56 T.C. 982 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner,52 T.C. 532 (1969), affd. 424 F.2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970). In fact a deliberately overstated deduction for a charitable contribution can be evidence of fraudulent intent. See Summers v. Commissioner,T.C. Memo. 1981-545. Respondent contends that he has carried his burden of proof in this case with clear and convincing evidence of the following: (1) that the petitioners claimed a deduction on their 1976 return for a charitable contribution which they knew they had not made to an organization which they knew did not *517 qualify to receive such contribution; (2) that during the audit of the return the petitioners attempted to mislead Revenue Agent Burns into allowing the deduction by furnishing him with a false document; and (3) that in an interview on March 18, 1980, petitioner, Lawrence L. McAlpine, attempted to mislead Special Agent Billings and his associate, Special Agent George L. Lindholm, into accepting the deduction by making false oral statements. We will consider each of respondent's contentions in the order listed. (1) Was A Deduction Claimed For A Contribution Which Was Not Made?
At the trial Dr. McAlpine testified that in 1976 he contributed certain medical equipment, furniture and receivables to the Palmdale Youth Ranch which he understood to be a ranch or camp that Donald O. Dockendorf was trying to operate for troubled or disturbed children. Dr. McAlpine also stated that prior to the death of Dockendorf and his wife in 1980 in a plane crash, Dockendorf bought, sold, altered and repaired all types of medical equipment and furniture for about 100 doctors in the tri-county area of San Luis Obispo, Santa Barbara, and Ventura. Dr. McAlpine had known Dockendorf both in *518 business and socially for several years and saw him at least two or three times each week during 1976. Among other things, they were fellow members of the Lacumbre Masonic Lodge and at an earlier time had worked together in the Sea Scouts. Some time in 1975 Dockendorf first approached Dr. McAlpine in a round about way to either make a tax deductible contribution to the ranch or associate with Dockendorf in the operation of the ranch. At that time Dr. McAlpine declined because he did not need a tax deduction and because of certain other personal entanglements. Later on in 1976 Dr. McAlpine changed his mind and purportedly gave to Dockendorf for the ranch the medical equipment and furniture plus the receivables which all together had a value of at least $40,000. According to McAlpine's testimony the medical equipment and furniture included in the contribution came from two sources. The first source was Southern California Cytology Association and the second source was the Port Hueneme Health Center. Southern California Cytology Association was a corporation which Dr. McAlpine, who was then practicing pathology, and Elizabeth J. Ellsworth, a cytologist, organized in or about *519 1967 to do and perform pathological work at the Santa Barbara General Hospital. [3]The corporation was active until about 1970 and during this period it accumulated various pieces of equipment such as: (1) a binocular microscope with magnification to 2000 power, an electronically controlled light meter and a separate power supply; (2) a teaching microscope with a projected head and separate power; (3) two small Lux microscopes; (4) a water bath used for enzyme analysis; (5) a photovolt for electrophoresis; (6) a cintilation counter for measuring variances in radiation; and (7) a number of jars and other items of glassware and paperware. In or about 1970 Southern California Cytology Association became inactive or defunct and at some point thereafter Mrs. Ellsworth apparently transferred her interest in the corporation which was very nominal to Dr. McAlpine. At this time the corporation's only assets consisted of the aforesaid medical equipment, some of which was stored in Dr. McAlpine's garage until it *520 was given to Dockendorf in 1976. The balance remained at the hospital where it was used by the hospital laboratory in return for its care and storage until about 1971 when it was picked up by or for Dr. McAlpine and stored in his garage until Dockendorf picked it up. Port Hueneme Health Center was a medical partnership in which Dr. McAlpine and four other physicians carried on a family practice as partners from about 1973 to 1975. In its operation the medical partnership had eight examining rooms, two consulting rooms, a waiting room, a nurse's station, a reception department, a billing department, and an operating suite. The partnership was dissolved in 1975. In the dissolution Dr. McAlpine received all of the equipment and furniture from the eight examining rooms, the operating suite, and the waiting room, having a value in Dr. McAlpine's opinion of about $23,000. He also received an X-ray machine with a value of about $10,000. Dr. McAlpine stated that all of the above property except the X-ray machine was moved from the partnership premises to a medical office building located adjacent to his office at 815 Cooper Street. The X-ray machine was removed to the Oxnard Community *521 Hospital where in exchange for care and storage it was used as a back-up machine. According to Dr. McAlpine's testimony, he gave all of the furniture, fixtures and equipment which he received from Southern California Cytology Association and Port Hueneme Health Center to Donald O. Dockendorf in 1976 with the understanding that Dockendorf was receiving the same for Palmdale Youth Ranch.At and before the transfer of the property Dockendorf assured McAlpine that Palmdale Youth Ranch was a nonprofit corporation duly qualified to receive tax deductible contributions. It was also understood by Dr. McAlpine that most if not all of the property could not be used as such by the ranch but that Dockendorf had the ability and the contacts to sell and convert the property to cash. It was also understood by McAlpine and Dockendorf that the property would remain where it was in 1976 until such time as Dockendorf decided to pick it up. As a result, some of the property remained in McAlpine's garage and some remained in the medical building until Dockendorf was able to sell or otherwise dispose of the same. Dockendorf disposed of some of the equipment stored in the medical building by permitting *522 the new doctors who rented space in the building to use the equipment until they could pay for it. Some of this equipment was still at the medical building and perhaps even in Dr. McAlpine's garage at the death of Dockendorf in 1980 or even at the time of the trial. Dr. McAlpine testified that in 1976 he also gave Dockendorf for the Palmdale Youth Ranch two receivables, one for $5,000 and one for $2,500. He said that the $5,000 receivable had been created when at some time prior to 1976 he loaned $5,000 to Melinda Chormicle, the daughter of Anita Chormicle, a friend of his. The money was advanced so that the daughter could make a down payment on a house in San Diego. The loan was not represented by a promissory note or any other written instrument other than Dr. McAlpine's check which he gave to Mrs. Chormicle for delivery to the daughter. There was no understanding as to the amount, if any, of interest which was payable on the loan and the repayment date was not specified. It was understood by Dr. McAlpine and Mrs. Chormicle that the loan would be repaid when the daughter sold the house. No written assignment of the receivable was executed by McAlpine to Dockendorf or to *523 the Palmdale Youth Ranch. Dr. McAlpine merely told Dockendorf that the receivable was his to collect for the ranch and he later told Mrs. Chormicle to have the daughter pay the $5,000 to Dockendorf. Dr. McAlpine's testimony contains even less detail with respect to the alleged $2,500 loan. He merely stated that he gave the receivable to Dockendorf in 1976, that the receivable was due from Dennis Delfo for funds which McAlpine had advanced to Delfo, that the loan was not represented by a promissory note or other document, bore no interest, and was not due at any specific date. At the time of the trial the loan had not been repaid. The record contains other evidence which tends to corroborate Dr. McAlpine's testimony at least in part with respect to the contribution, the nature and value thereof, the manner in which it was made, and the belief of Dr. McAlpine that the contribution was tax deductible. For instance, the testimony of Mrs. Ellsworth generally corroborated his statements concerning the organization, operation and termination of Southern California Cytology Association, the nature and amount of its equipment, and the ultimate disposition of such equipment. Mrs. Ellsworth *524 also knew Dockendorf and was aware of the nature of his employment, his acquaintance with Dr. McAlpine, his work with youth clubs, his association with Palmdale Youth Ranch in 1976, his solicitation of funds and other contributions for the ranch and his repeated assertions that such contributions were tax deductible. Dockendorf's association with the ranch, his solicitation of contributions for it, his repeated assertions that it was a nonprofit organization, his acquaintance with Dr. McAlpine and his statements that Dr. McAlpine had made contributions to the ranch were also corroborated by the testimony of Diane Mollock, Mary Rose Valenzuela, Ofelia Castillo, and Mrs. McAlpine. The testimony of Mrs. Valenzuela and Mrs. Castillo also tended to corroborate the fact that Dockendorf trafficked and traded in medical equipment, that he was frequently on the premises at Cooper Road, and that during 1976 and thereafter equipment belonging to Dockendorf or the Palmdale Youth Ranch was stored on the premises at Cooper Road and in the adjacent medical building. Mrs. McAlpine's testimony tended to corroborate that some equipment was stored in their garage. With respect to the equipment *525 which Dr. McAlpine testified that he acquired from the Port Huemene Health Center, Dr. Charles H. Avery testified that he rented space in 1977, 1978, and 1979 in the medical building adjacent to Dr. McAlpine's office and that his space contained six examination rooms, a large waiting room, and a reception area. At that time the space was furnished with all of the equipment a primary care physician would need and had a replacement value in the opinion of Dr. Avery of at least $25,000. Dr. Avery said that the equipment was under the general control of Dockendorf but that Dr. Avery was permitted to use it so long as he purchased his medical supplies from or through Dockendorf. In negotiations with Dockendorf about a possible lease or purchase of the equipment, Dr. Avery learned from Dockendorf that it belonged to Palmdale Youth Ranch and had been the subject of a contribution to the ranch by Dr. McAlpine. Some time in 1978 or 1979 Dr. Avery was told by Dr. McAlpine that the equipment was originally obtained by McAlpine from the liquidation of Port Huemene Health Center. From time to time Dockendorf would sell a piece of the equipment after first offering to permit Dr. Avery to buy *526 it. Dockendorf had a key to the space and could come and go as he saw fit without objection by either Dr. Avery or Dr. McAlpine.
With respect to the $5,000 loan receivable Anita Chormicle testified that she had known Dr. McAlpine socially for over 15 years; that they were good friends; that in or about 1975 Dr. McAlpine advanced $5,000 to her daughter, Melinda Chormicle, so that the daughter could make a down payment on a house in San Diego; that the funds were advanced by Dr. McAlpine giving her a check which she delivered to the daughter; that she was later told by Dr. McAlpine that the funds should be repaid to Dockendorf; that she so advised the daughter; and that she did not know whether the loan had been repaid or not. Melinda Chormicle was not called as a witness and the record contains no explanation for her failure to testify. The only evidence which tends to even remotely corroborate any part of Dr. McAlpine's testimony with respect to the $2,500 loan consists of statements by both Dr. Avery and Mrs. Castillo that Dennis Delfo, the alleged recipient of this loan, had been employed as an X-ray technician by Dr. McAlpine for several years. Here again, Delfo was not called *527 as a witness and neither party offered any explanation as to his absence. (2) Did The Petitioners Knowingly Furnish The Revenue Agent With A False Document?
The disputed deduction was placed on the 1976 return by Walter Wolf or by a member of his staff under his supervision. Mr. Wolf is a reputable certified public accountant with one of the largest and most highly regarded accounting firms in Santa Barbara. During the years 1976, 1977, and 1978 and for several years prior thereto Wolf did the accounting for South Coast Pathology Services, including the preparation of its corporate income tax returns. During the same period he prepared the individual income tax returns for Dr. and Mrs. McAlpine. In the preparation of the individual returns he used whatever information was already available to him because of his work for the medical corporation plus certain additional detail such as itemized deductions furnished to him each year by the petitioners. Some detail with respect to a contribution to the Palmdale Youth Ranch appeared among the information furnished to Wolf by Dr. McAlpine in March or April of 1977 for use in the preparation of the individual return *528 for 1976. Because of the size of the contribution and because of the absence of any cancelled check, receipt, or other data in support of the deduction, Wolf requested that Dr. McAlpine obtain and furnish him with a receipt or other substantiation for the deduction. Dr. McAlpine replied that Donald O. Dockendorf would furnish Wolf a letter substantiating the deduction. A few days later Dockendorf hand delivered to Wolf what purports to be a letter dated August 15, 1976, from Palmdale Youth Ranch by Donald O. Dockendorf to Dr. McAlpine. At the trial respondent objected to the admission of the letter on the grounds that it was hearsay for the purpose of proving the proof of its contents. For that purpose it is hearsay and is not admissible but the document is admissible as having been identified by Wolf as being the basis for placing the deduction on the return. The letter expresses gratitude by the ranch for the receipt of certain furniture and equipment with an appraised value of $32,500 plus a cash contribution of $7,500. At the time he delivered the letter to Wolf, Dockendorf assured Wolf that the ranch had been qualified as a charitable nonprofit organization and was exempt *529 from Federal taxation. With these assurances from Dockendorf and with the aforesaid letter as substantiation, Wolf placed the deduction on the return. He testified that he considered the letter a proper receipt of an independent third party and saw no reason to make any further inquiry as to the qualification of the ranch under section 170(c) to receive deductible contributions. Wolf, however, had no explanation as to why the deduction was erroneously shown on the return as being all in cash, but he readily admitted that the error was one for which he or someone in his office was responsible. He stated that he knew at the time the return was prepared that the claimed contribution included personal property having a value of $32,500. During the audit Revenue Agent Burns asked Wolf for verification of the charitable deduction. Wolf furnished him with a copy of the Dockendorf letter. The letter contained a statement to the effect "[a]s you know we are a Non-Profit Corporation, the Number is 0807004 PY4R, this number may be useful to your accountant. At the trial respondent introduced a copy of the articles of incorporation of Palmdale Youth Ranch which bears the number 807004. *530 The articles also bear a stamp indicating that they were filed in the office of the Secretary of State for the State of California on January 19, 1977. On brief the respondent contends that the Dockendorf letter is false. His argument is based on the fact that the letter bears the date of August 15, 1976, which is over five months before January 19, 1977, the date upon which the articles of incorporation were filed in the office of the Secretary of State and was assigned the number used in the letter. According to the respondent, this "scenario strongly suggests that * * * [the letter] was prepared by Dockendorf between the time Dr. McAlpine first spoke to Wolf concerning the contribution and the time Dockendorf presented the letter to Wolf." The respondent, however, fails to explain how a scenario which "suggests" that a false document prepared by Dockendorf constitutes clear and convincing evidence of fraud perpetrated by Dr. and Mrs. McAlpine.
His scenario becomes even more confusing and less clear and convincing when considered in connection with the testimony of Paul Salzman and Cynthia L. Kline, both of whom were witnesses for respondent. In answer to a question by respondent's *531 counsel, Mr. Salzman, one of the original directors of the corporation represented by the articles filed on January 19, 1977, stated that "the formation of the non-profit corporation which was done in accordance with the papers that you showed me * * * [articles of incorporation filed on January 19, 1977] * * * still exists and * * * I'm the sole owner of it, although there are no assets in the corporation at this point and there never have been." [Emphasis added.] In view of this statement it is apparent that the Palmdale Youth Ranch was never placed in the corporation represented by the articles filed on January 19, 1977 and, therefore, we are unable to comprehend how the date the articles were filed, or the number which appears thereon, have any bearing upon the validity of a contribution allegedly made to Dockendorf for the ranch in 1976. Furthermore, Cynthia L. Kline, who was employed at the ranch from May to December of 1975, testified that while she was there Dockendorf was at least a part owner of the ranch and active in its operation. (3) Did Dr. McAlpine Make False Oral Statements To The Special Agents?
The first contact which Special Agent Billings *532 had with Dr. McAlpine was on March 18, 1980. On that date Billings accompanied by Special Agent George E. Lindholm, first went to Dr. McAlpine's office at 11:00 a.m. They did not see the doctor at that time, but at 11:50 a.m. the doctor called Billings and after a few minutes of conversation went directly to Billings' Office, arriving there at 12:00 noon. At the office of Special Agent Billings Dr. McAlpine was met by Billings and Lindholm, both of whom were armed. They seated him at a table in a conference room which was approximately 12 X 20 feet and which had two doors. The doors were closed but not locked during the interview which followed. At the outset, both agents identified themselves to Dr. McAlpine, and Billings read to him the usual constitutional warning, including the specific advice that he could if he desired seek the assistance of an attorney before responding to any questions. Agent Billings then started to interview Dr. McAlpine by asking him his name and address. After about 30 seconds to a minute of hesitation, Dr. McAlpine stated that he thought he should consult a lawyer. At this point Special Agent Billings closed his file and the agents arose from *533 the conference table. At or about this time but after another hesitation of a minute or more, Dr. McAlpine, who was still seated at the conference table, asked some question to the effect, "What is this all about?" He testified that this statement was preceded by the phrase," off the record" so that his entire question was: "Off the record, what is this all about?" The agents, however, testified that they "don't recall" any reference to being "off the record." In any event, Billings and Lindholm returned to their chairs, Billings reopened his file, and the agents proceeded to interview Dr. McAlpine. During the interview, the doctor freely answered questions about numerous subjects including the nature, possible sources of, and reasons for the questionable contribution. The interview lasted for two hours and the memorandum of the interview prepared by Agent Billings contains eight pages of single-spaced, typewritten material. That portion of the memorandum which deals with the contribution is as follows: Mr. MCALPINE made a contribution to the Palmdale Youth Ranch in 1976. This contribution consisted of two households of furniture which he obtained from Louisiana from the Estate *534 of Emily Turner of Leadsville, Louisiana and from the Estate of Louis McAlpine, also from Leadsville, Louisiana. MCALPINE kept 2 pieces of furniture and contributed the rest of the furniture to the Palmdale Youth Ranch. The furniture consisted of tables and chairs, beds, stove and refrigerator, etc. In addition to the furniture he contributed cash to the Palmdale Youth Ranch. This cash was in the manner of 3 separate bags of silver coins which he had purchased from a coin dealer worth $2,500 each. The man who handled the Palmdale Youth Ranch was a man named DONALD DOCKENDORF. Mr. DOCKENDORF used this furniture in the Palmdale Youth Ranch. Mr. MCALPINE met Mr. DOCKENDORF from the Masonic Lodge of which they were both members. Mr. MCALPINE stated that he bought these 3 bags of coins and put them under his bed because he felt they would be financial security in hard times. He purchased these bags of coins from a coin dealer which he also knew from the Masonic Lodge and this dealers [sic] name was HARRY KABAOFF who was also from Santa Barbara. He does not know where or if this dealer actually had a shop but he feels he did have one in Santa Barbara. Mr. MCALPINE stated that his *535 accountant, Mr. WOLF, told him the Palmdale Youth Ranch was a tax exempt organization and that in fact it was Mr. WOLF who suggested that he make this contribution to the Palmdale Youth Ranch in the first place. Mr. MCALPINE's father and mother live [sic] in Evanston, Louisiana and it was never intended that this furniture was to be shipped out here to California. He ended up with it because his mother and father didn't want it. Mr. DOCKENDORF is now deceased as his airplane crashed in January, 1980, in Santa Barbara Bay. Mr. MCALPINE also stated that some of the furniture and fixtures that was donated to the Palmdale Youth Ranch came from his office on Cooper Road. This consisted of chairs, tables and beds. He stated that there was also some medical equipment donated. While the ranch didn't use this equipment, DOCKENDORF was a medical supply peddler and therefore could make use of the donated equipment. Mr. MCALPINE stated that it was DOCKENDORF who made the appraisal as to the dollar value of the furniture, fixtures donated.
At the trial, respondent introduced proof that Dr. McAlpine had received no assets of any kind from the Estate of Emily Turner or the Estate of *536 Lewis McAlpine; that respondent's agents were unable to locate a coin dealer in Santa Barbara or elsewhere by the name of Harry Kabaoff; that the Masonic Order had no record of such a person; and that Walter Wolf had not told Dr. McAlpine the Palmdale Youth Ranch was a tax exempt organization or suggested that Dr. McAlpine make a contribution to it. During his testimony Dr. McAlpine repeatedly denied that he had told the special agents that Walter Wolf had advised him the ranch was tax exempt or had suggested that he make a contribution to it. He also denied telling the agents that he had bought $7,500 worth of coins from Harry Kabaoff or had given any coins to the ranch. He admitted that he might have made the statements about receiving furniture and fixtures from the two estates and included these items in the contribution. He insisted, however, that all statements made by him to the agents were only made after he had requested to see his lawyer and the agents had agreed that such statements were "off the record." Petitioners objected to the introduction of any evidence including Dr. McAlpine's own testimony as to the statements made by him at the interview on March 18, 1980, on *537 the grounds that such introduction would violate his rights under the Fifth Amendment. They persisted in their objection after counsel for the respondent had stated for the record that to his knowledge neither petitioner was under any criminal investigation at that time by the respondent and none was contemplated. A ruling on the admissibility of the evidence was reserved until briefed by the parties. On brief, petitioners contend that the admission of the above evidence would violate their constitutional rights under the Fifth Amendment. They rely primarily upon the decision of the Seventh Circuit in Romanelli v. Commissioner,466 F.2d 872 (7th Cir. 1972), revg. 54 T.C. 1448 (1970). However, in Brod v. Commissioner,65 T.C. 948 (1976), we respectfully declined to follow the decision in Romanelli in cases such as this which are not appealable to the Seventh Circuit. In Brod a special agent interviewed the taxpayer on four different dates over a period of about five weeks without advising him of his constitutional rights. At the fifth interview he was so advised. The taxpayer was thereafter indicated in the District *538 Court under section 7201 but prior to his trial he moved to suppress any and all evidence obtained from him prior to the time he was advised of his constitutional rights by the special agent. The District Court granted his motion. United States v. Brod,324 F. Supp. 800 (S.D. Tex. 1971). The government appealed from the order granting the motion but later dismissed its appeal as well as the criminal case in the District Court. In a subsequent civil action in this Court, the petitioner filed a motion to suppress the same evidence that was previously suppressed by the District Court in the criminal case. Judge Scott denied the motion to suppress and in an opinion reviewed by the Court stated: In our view, * * * a civil fraud tax case is not "a criminal case" nor "the adjunct of one," a taxpayer may be required in such a case to testify to the facts which show his liability for the tax and establish that his underpayment was due to fraud. He has no protection by the fifth amendment from giving testimony which will show that he has a civil fraud liability. For a taxpayer *539 to be justified in refusing to testify to facts concerning his fraudulent omission of income from his return in a case involving only civil fraud, it must be shown that such facts might tend to subject him to criminal charges. Where, as in this case, there remains no possibility of criminal prosecution, petitioner is properly required to testify to all facts concerning his income and expenses including those he furnished to the revenue agent and special agent when he was interviewed by them without being informed of his constitutional right to remain silent and to have the assistance of counsel. 65 T.C. at 955. In Brod, Judge Scott carefully reviewed the opinions of this Court in both Harper v. Commissioner,54 T.C. 1121 (1970) and Romanelli v. Commissioner,54 T.C. 1448 (1970), and concluded that we should not follow the decision of the Seventh Circuit in Romanelli v. Commissioner,supra. Consequently, our established position on the evidentiary question involved here is "that petitioners, facing no real prospect of criminal *540 prosecution * * * may not suppress their own statements and papers on [constitutional grounds] in this civil proceeding, even if these things were originally unconstitutionally obtained." Riland v. Commissioner,79 T.C. 185, 207 (1982). There is no real prospect of criminal prosecution in this case because the respondent terminated the criminal investigation of Dr. McAlpine without an indictment and at the trial respondent advised the Court and Dr. McAlpine that neither he nor Mrs. McAlpine were under criminal investigation by the respondent at that time and that no such investigation was contemplated. At the beginning of the interview on March 18, 1980, Dr. McAlpine was given the usual constitutional warning including the advice that he had the right to consult with counsel before answering any question. He indicated at that time that he wanted to talk to his lawyer. The agents started to withdraw, but then after some conversation during which he states that the special agents agreed to continue "off the record" he answered any and all questions freely. Even if we assume that his version of the interview is correct, we are unable to see how we can avoid the *541 rule laid down in Brod, where the taxpayer received no warning at all. We conclude, therefore, that in this case evidence of what transpired at the interview, including Dr. McAlpine's own testimony, is admissible. Nevertheless we have reservations about the weight to be afforded such evidence because the record as a whole indicates (1) that the statements made by Dr. McAlpine could have been innocently misunderstood by the agents; (2) that in the investigation made subsequent to the interview no attempt was made by the agents to permit Dr. McAlpine to explain or otherwise clear up the discrepancies which appeared between what the investigation disclosed and what the agents understood he said during the interview; and (3) that there may have been some bias by the special agents in reporting the interview due to previous encounters between Dr. McAlpine and employees of the Internal Revenue Service. From our close observation of Dr. McAlpine during his testimony, we concluded that he is a hard-working, proud, and highly intelligent man who is well-educated in his field. We also observed, however, that he is persistent in expressing his views and obstinate to a fault. He also *542 has a tendency of occasionally hesitating for several seconds or even minutes before answering a question. [4] Whether by design or otherwise, this hesitancy on his part when coupled with his persistence and obstinacy, tends in our opinion to confuse and after a time to infuriate almost any questioner. Several times during his testimony his hesitation lead the questioner to conclude that Dr. McAlpine was silently agreeing with some statement which appeared in the question. At other times, the hesitation caused the examiner to ask another question or perhaps two other questions and then Dr. McAlpine would stubbornly insist upon answering all pending questions at once. From our observation it is not difficult to see how Mr. Billings and Mr. Lindholm could have misunderstood some of Dr. McAlpine's replies during their first and only interview. For instance, both McAlpine and Dockendorf were members of the Lacumbre Masonic Lodge and in the interview this fact came out undoubtedly as part of the background *543 for the alleged contribution. When considered together with Dr. McAlpine's manner of answering questions, it is easy to understand how membership in the lodge could also have been mistakenly extended by the agents to Harry Kabaoff. The same mannerisms could easily account for the fact that Harry's last name was spelled at least five different ways [5] during the trial, and this in turn, could account for the fact that the Masons were unable to find his name on their rolls. Dr. McAlpine's complicated and confusing manner of answering simple questions could also account for the fact that according to the agents he said that Mr. Wolf was the first to tell him that Palmdale Youth Ranch was tax exempt and suggested that he make a contribution to it. In view of the fact that during 1975 through 1978 Dockendorf apparently told numerous people about the ranch, its exemption, and its need for contributions, it is almost a certainty that he was the original source of this information. It should also be noted that Wolf testified that he did not meet Dockendorf or discuss the ranch with him until March or April of 1977. Wolf also *544 testified that he had not heard of the ranch until the question came up about substantiating the deduction in or about March of 1977. Wolf's testimony clearly establishes that during 1976 when Dockendorf was advising several people, including McAlpine, that the ranch was tax exempt, Wolf was not even aware of the existence of the ranch and, therefore, his testimony tends to corroborate Dr. McAlpine's denial that Wolf was the first to tell him of its tax exemption. Again the doctor's mannerism could account for the agents' understanding that he said in the interview that part of the property included in the contribution came from South Coast Pathology Services, Inc. During the first day of the trial, confusion arose on more than one occasion with respect to whether Dr. McAlpine was testifying about Southern California Cytology Association, which he stated was the source of a substantial portion of the contribution, or South Coast Pathology Services, which was not the source of any part of the contribution. As pointed out before, Dr. McAlpine's association with Southern California Cytology Association as well as the nature and amount of its equipment and the eventual transfer of *545 the equipment to Dockendorf for the use and benefit of the ranch is corroborated by the testimony of Mrs. Ellsworth.
As pointed out by the petitioners, discrepancies such as the above could have been confirmed or reconciled in a second interview of Dr. McAlpine. The record, however, contains no evidence tending to indicate that such an interview was requested by the agents. In fact, on brief respondent admits that no such request was made although in the last paragraph of his memorandum of the first interview, Mr. Billings carefully noted that he advised Dr. McAlpine to talk to his lawyer so that arrangements could be made for a more detailed interview at a later date. With regard to the possibility that the agents may have been biased in their report of the statements made by the doctor in the interview, we need to note at the outset that both agents testified that prior to March 18, 1980, they had no contact of any kind with Dr. McAlpine and knew of no previous contact by him with any other employee of the Internal Revenue Service. Their statement to this effect must be considered, however, in connection with the fact that their post of duty was Oxnard, California, which *546 is a small town. The Audit Division and the Criminal Investigation Division of the local office of the Internal Revenue Service were in different rooms but in the same suite of offices. From the record it is not clear but presumably the Collection Division of the Internal Revenue Service was similarly situated. Special Agent Lindholm stated that he frequently had lunch with and otherwise socialized with other employees of the Internal Revenue Service, including Revenue Agent Burns, who did the preliminary audit in this case. In view of the foregoing, it is difficult to accept without question the assertion by the special agents that they had never heard of Dr. McAlpine before March 18, 1980. This is especially true in view of his flamboyant nature, the smallness of the town, the relatively few members of the local office of the Internal Revenue Service, and their close contact with each other. Furthermore, if any credence at all is to be given to the testimony of Mrs. Ofelia Castillo, the conduct of the special agents upon first entering Dr. McAlpine's office at about 11:00 a.m., on March 18, 1980, indicates that this was not just a routine case with respect to which they had *547 no prior knowledge of the taxpayer or of his dealings with the Internal Revenue Service. In other words, we also have reservations about Mr. Billings' testimony that he "had an investigation which I was assigned to make for the years '76-7-and-8, and that is really the only information that I had." According to the testimony of the agents, they politely entered the office, identified themselves to Mrs. Castillo, and asked to see Dr. McAlpine. She went into another office, came back and indicated that Dr. McAlpine was not in the office but was making his rounds at the hospital. At that time they gave her their card, requested that she have Dr. McAlpine call them, and politely left, although they suspected that Dr. McAlpine was in the office all of the time.
In contrast, Mrs. Castillo testified that when the agents entered the office their coats were open and she observed that they were both armed because their guns were clearly visible, not only to her, but to the several patients who were in the waiting room. She also stated that the agents moved in ahead of the patients who were in line at the window off the waiting room in which she was working, identified themselves to her, *548 and demanded to see Dr. McAlpine. When she informed them that Dr. McAlpine was making his rounds at the hospital, they asked to see his records, and when she declined they raised their voices and while not using any particular profanity asked something to the effect, "Where the hell is Dr. McAlpine hiding?" She then repeated her statement that he was at the hospital and added that they could see him there if they wished, but they gave her a card, asked her to have the doctor call them, and left the office, but not before their conduct had caused all the patients in the waiting room to leave. She further testified that when Dr. McAlpine returned from the hospital at about 11:50 a.m., she told him why the waiting room was empty, and he immediately called Mr. Billings and left shortly thereafter for his office. The agents admit that Dr. McAlpine called them about 11:50 a.m. and was in their office at 12:00 noon. Both agents admit that they were armed during their visit with Mrs. Castillo and during the interview with Dr. McAlpine, but they state that this is not unusual on the first contact with a taxpayer. They both emphatically deny that their guns were exposed at any time, either *549 to Mrs. Castillo or to Dr. McAlpine. With respect to previous contacts with the Internal Revenue Service, Dr. McAlpine stated that in or about 1972 or 1973 he was involved in a lawsuit which momentarily tied up the funds with which he had planned to pay his income tax for an earlier year and that while such funds were tied up, certain members of the local office of the Collection Division of the Internal Revenue Service made several visits to his office in connection with the account. According to him, the visits by the collection personnel became progressively more belligerent until they threatened to close his office unless he paid the outstanding account. At that time he sold some property and paid the amount due. Dr. McAlpine also stated that at some later date, he believed that it was in 1975 or 1976, a check of his which was given to the Internal Revenue Service in payment of certain employment taxes was apparently credited by the Internal Revenue Service to an incorrect account. As a result, his tax account showed an outstanding balance, even though he had the cancelled check showing the payment. According to him this error by the Internal Revenue Service caused at *550 least 10 visits to his office by collection personnel, including one lady who was particularly vicious. Apparently he was unwilling to surrender the actual cancelled check to the Collection Division for its examination and the collection personnel were unwilling to accept a photostatic copy of the check. After several months the matter was finally resolved when the misplaced credit was finally located and Dr. McAlpine executed an affidavit to the effect that he was not related to, or even acquainted with, the individual to whom it was credited and who lived, to the best of his recollection, in New York or Pennsylvania. The doctor's testimony with respect to these two episodes was generally corroborated by Mrs. Castillo who was employed by Dr. McAlpine from 1972 to 1980 as office manager and interpreter. Respondent, however, contends that her corroborating testimony should be discounted because she was a former employee of the doctor. In fact, respondent contends that all of the testimony produced by the petitioners should be discounted because "all of petitioners' witnesses either had a direct financial interest in the outcome of the case (Dr. McAlpine), were former or current *551 employees of Dr. McAlpine (Ofelia Castillo, Diane Mollock, Mary Rose Valenzuela, Elizabeth Ellsworth and Dr. Charles Avery), or were personal friends of the petitioners (Anita Chormicle)." Needless to say, if this were a valid argument we would also have to discount the testimony of Special Agent Billings and Special Agent Lindholm in the same manner, since they are employees of the respondent.
We are also unable to accept another argument by respondent which is that the failure of the petitioners to produce certain evidence such as the testimony of witnesses or documents in the possession of the witnesses, warrants an inference that if produced such evidence would be unfavorable to the petitioners. We have already noted the absence in this case of two apparently important witnesses, Melinda Chormicle and Dennis Delfo. The absence of certain others, such as John Poucher, one of the lawyers who represented Dr. McAlpine during the criminal investigation, and Dr. Lowe, a former partner of Dr. McAlpine, are mentioned in respondent's brief. Obviously all four of these witnesses and any documents in their possession were equally available to the respondent, who has the burden of proof *552 on the only issue in this case, and to draw the inference suggested by the respondent would amount to a shifting of at least part of this burden to the petitioners. When viewed as a whole, the record in this case establishes beyond any doubt that there was a substantial amount of animosity towards the Internal Revenue Service by Dr. McAlpine and his employees and that such animosity had its origin at some date prior to March 18, 1980. The existence of animosity on the respondent's side of the case is not as evident but it is there nevertheless. One of several indications is the deliberate and careful manner in which the agents and even counsel for respondent repeatedly referred to Dr. McAlpine as Mr. McAlpine until some mention was made of the practice by the Court. For example, in his memorandum of the first interview, Mr. Billings used Mr. McAlpine 61 times and Dr. McAlpine only twice. The deliberate slight is apparent from the fact that Dr. McAlpine was only used where his name appeared with other physicians who were always referred to as doctor, both in the memorandums of the agents and at the trial. We are aware, of course, that under our rules all prefixes or *553 titles "such as 'Mrs.' or 'Dr.,' shall be omitted from the caption" of a case. Rule 23(a)(1). Common courtesy, however, would seem to dictate that except with respect to captions, earned titles such as doctor should be used or at least some explanation should be given for their omission. When the mutual animosities of the parties, generated apparently by the previous difficulties of Dr. McAlpine with the Internal Revenue Service, are taken into consideration, the petitioners' account of what transpired at the office and during the interview on March 18, 1980, is more logical than the pristine version advanced by the agents. Although we are unable to accept without question Dr. McAlpine's description of the "muscling" which he said he received during the interview, we are satisfied that he was lead to believe, perhaps more by himself than the agents, that after he indicated he wanted to consult a lawyer the interview was "off the record" meaning that from that point on it was informal, not under oath, and therefore not binding on him. In our opinion, the avoidance of such problems is the reason for the provision in the Special Agents Handbook, [6] which states unequivocally that *554 a custodial or noncustodial interview must cease when the taxpayer indicates he wishes to consult a lawyer. Once such a statement is made by the taxpayer, any further questioning by the agents is susceptible to the problem we have here. In view of all of the foregoing, we conclude that the respondent has failed to prove by clear and convincing evidence (1) that the petitioners claimed a deduction on their 1976 return for a charitable contribution which they knew they had not made to an organization which they knew did not qualify to receive such contribution; (2) that during the audit of the return the petitioners attempted to mislead the revenue agent into allowing the deduction by furnishing him with a false document; or (3) that during the criminal investigation petitioner, Lawrence L. McAlpine, attempted to mislead the special agents into approving the deduction by making false oral statements. Consequently, the respondent has failed to carry his burden of proving that *555 some part of the deficiency in tax is due to a fraudulent act or acts by the petitioners and the petitioners are not liable for the addition to tax provided by section 6653(b). In order to reflect the foregoing, as well as the concessions made by both parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. ↩
2. Gajewski v. Commissioner,67 T.C. 181 (1976), affd. by unpublished opinion 578 F.2d 1383↩ (8th Cir. 1978).
3. Pathology is the study of disease and its affect on the body, including its tissues and fluids. Cytology is the study of cells, including the effect of disease thereon.↩
4. At first, we attributed this tendency to an impacted wisdom tooth from which he was then suffering, but after some period of observation we concluded it was just a habit.↩
5. Three of the five were by Special Agent Billings.↩
6. Internal Revenue Manual, vol. V, part IX - Intelligence, ch. 9300, sec. 9384.2(b) at 28,216 (CCH). Internal Revenue Manual, vol. V, part IX - Intelligence, ch. 9400, sec. 9447.3(3)(d) and (e) (CCH).↩